# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00541-CR

**Christopher Lee Murray, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT
### NO. 13227, HONORABLE REVA TOWSLEE CORBETT, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Christopher Lee Murray guilty of the capital murder of a child under six years of age. *See* Tex. Penal Code Ann. § 19.03(a)(8) (West Supp. 2010). The State did not seek the death penalty, and the trial court assessed the mandatory punishment of life without parole. *See id.* § 12.31(a)(2); Tex. Code Crim. Proc. Ann. art. 37.071, § 1 (West Supp. 2010).

Appellant contends that the evidence is insufficient to support the guilty verdict. He also contends that the trial court erred by permitting the State to impeach its own witness with inadmissible evidence and then by refusing to give a limiting instruction regarding that evidence. Finally, appellant contends that the trial court erred by admitting improper opinion testimony and by overruling an objection to the State's jury argument. We overrule these contentions and affirm the conviction.

## BACKGROUND

In June 2007, appellant was living in a four bedroom residence near Paige with Victoria Helmer, his fiancee, Nicole Murray, their nine-month-old daughter, and Robbie Faske, Helmer's two-and-a-half-year-old son from an earlier marriage. Also sharing the residence were Rosie Cervantes, appellant's grandmother, Mary Cabrera, appellant's mother, and Jonathan (whose last name is not in the record), Cabrera's four-year-old son and appellant's half brother. Helmer was employed in Bastrop. Appellant was unemployed and shared child-care duties with his mother and grandmother.

On June 11, Helmer left for work at about 7:30 a.m. Approximately two hours later, Cervantes, Cabrera, and Jonathan left the house to run errands in Austin. This was, according to testimony, the first time appellant had been left alone with both Nicole and Robbie. All witnesses agreed that Robbie was in normal good health that morning. He had a bruise on his cheek caused by a fall against a tree three days earlier and a few other minor injuries that were the result of Jonathan's rough play.[1]

Cervantes and Cabrera returned home at about 1:45 p.m. Both testified that as they were unloading groceries in the kitchen, appellant entered the room carrying Robbie in his arms. The child was limp, and Cabrera testified that he was making a "gurgling" sound. Appellant told the women that Robbie had fallen and they should call 911. As Cervantes was making the call, appellant carried Robbie from the house, placed him in his car, and drove off. Appellant testified

---

[1] Jonathan has Down Syndrome. All of the family members testified that Jonathan liked to play with Robbie, but they tried to keep the boys apart because Jonathan was overly aggressive. He would push and hit Robbie, throw toys at him, and occasionally bite him.

2

that he drove to the volunteer fire station in Paige to seek help. Finding no one there, appellant decided to return home to await the ambulance. On his way, he lost control of the car (the exact reason is not clear) and drove into a ditch on highway 290.

Emergency medical personnel and sheriff's deputies were initially dispatched to the residence in response to Cervantes's call, but they were redirected to the scene of the accident a short distance away. They found appellant and Robbie at the side of the road, where a passing motorist had stopped and was performing CPR on the boy. A paramedic testified that Robbie was not breathing and had no pulse. The paramedic observed evidence of trauma to the head and body, and he noticed that the child's blood was beginning to pool, indicating that he had been dead for some time. Several witnesses who were present at the scene testified that appellant was agitated, calling out "my boy, my boy." Meanwhile, Helmer left work in response to a call and arrived at the accident scene. When told that Robbie was dead, she said "he killed my baby" and "arrest the son of a bitch."

Appellant testified that after his mother and grandmother left that morning, he was watching a movie while Robbie played. After hearing a "thump" in the computer room, appellant entered the room and found Robbie on the floor beside the chair, which was overturned. The child had a mark on his forehead but otherwise seemed unharmed by the fall. Appellant and Robbie later had a snack. Shortly after 1:00 p.m.,wanting to smoke a cigarette, appellant picked up Robbie and began to carry him out the front door. Appellant said that he lost his balance and, still holding Robbie, fell from the top of the steps leading from the door to the ground, which the evidence shows were thirty-two inches high. Appellant landed on the ground, on top of Robbie. Appellant testified that Robbie could not stand after this and was obviously hurt. Appellant carried the child to his

3

bedroom and placed him on the bed. Robbie appeared to be "in shock" and his eyes were dilated. Appellant testified that he did not call 911 or take Robbie to the emergency room in his car because he was "hoping he would get better." Twenty minutes later, when Cervantes and Cabrera returned home, Robbie's eyes "were rolling in the back of his head" and appellant "could hear a gurgling in his voice, in his lungs."

Appellant acknowledged that in his initial statements to investigators and his family, he failed to disclose that he had fallen on Robbie. Instead, he told them only about the fall from the chair in the computer room. Appellant testified, "I was in denial. I didn't want to believe that I caused my son's death. I was ashamed. I didn't get him help."

Dr. David Dolinak, the medical examiner, testified that he counted forty-six bruises on Robbie's head, twenty-four on his chest, twenty on his abdomen, thirty on his arms and legs, thirteen on his back and buttocks, and two on his penis. Most of these bruises were fresh, meaning that they were no more than thirty-six hours old. The child also had five broken ribs, and a vertebra in his neck was fractured.

The injuries that resulted in Robbie's death were to his head and abdomen. Dolinak found a five-inch Y-shaped fracture on the back of the child's skull. The impact to the head had caused considerable bleeding both on and under the surface of the brain. Dolinak testified that the brain injury had occurred on the day of Robbie's death, and he said that the child would have immediately manifested symptoms. Dolinak further testified that Robbie's bowel was torn and that a cup-and-a-half of blood and stomach contents had leaked into his abdominal cavity. The boy's

pancreas and small intestine were bruised, and his liver had three lacerations. Dolinak testified that these injuries would have required numerous forceful impacts.

Dolinak testified that some, but not all, of the rib fractures could have been the result of CPR. Dolinak also agreed that a heavy man falling on the child from the top of the steps could have caused some of Robbie's injuries, but he "[did not] see how" that scenario could cause all the injuries he observed. In Dolinak's opinion, the cause of death was homicide due to multiple blunt force trauma.

Dr. James Lukefahr of the University of Texas Health Science Center in San Antonio, an expert in child abuse, examined Dolinak's autopsy report and photographs, and he agreed that the cause of death was multiple intentional blunt force trauma. Lukefahr testified that some of the bruises on Robbie's body were in a pattern that suggested that they "might be from knuckles from a closed fist." Some of the other bruises had straight, sharp edges, which Lukefahr testified was indicative of "object injuries." He stated that the brain injury would have resulted in an almost immediate loss of consciousness. According to Lukefahr, the abdominal injury was "very serious," would have caused "intense pain," and could have occurred "a couple of hours" before death.

Lukefahr stated that a fall from a chair or from the steps could have caused some of Robbie's injuries. He also stated that it was possible, if unlikely, that an adult falling on the child could have caused either the brain or abdominal injuries. Lukefahr testified, however, that "there's no accidental scenario that would satisfactorily explain [Robbie's] constellation of injuries." He said that the "sheer number" of injuries demonstrated that they were deliberately inflicted. Lukefahr

5

testified that in his opinion, "there's plenty of evidence that someone really set out to seriously hurt this child."

## SUFFICIENCY OF EVIDENCE

The indictment alleged in three paragraphs that appellant knowingly caused Robbie's death by striking his body and head with appellant's hand or foot, by striking his body and head with an unknown object, and by striking his body and head against an unknown object. The court's charge submitted the three theories of the offense disjunctively, and the jurors returned a general verdict of guilt. In two points of error, appellant contends that the evidence is legally and factually insufficient to sustain the guilty verdict.

After his brief was filed, the court of criminal appeals held that appellate courts will no longer employ distinct legal and factual sufficiency standards when reviewing the sufficiency of the evidence to sustain a criminal conviction. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Instead, the only standard for determining whether the evidence proves the defendant's guilt beyond a reasonable doubt is the *Jackson* due process standard. *Id.*; *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Under *Jackson*, the question presented is whether, after viewing all the evidence in the light most favorable to the verdict, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. 443 U.S. at 319. The reviewing court may impinge on the trier of fact's discretion only to the extent necessary to guarantee the fundamental protection of due process of law. *Id.*

Appellant urges that the evidence does not support a finding beyond a reasonable doubt that he knowingly caused Robbie's death. He points out that there was no evidence that he

6

had engaged in violence against Robbie or the other children prior to June 11. Helmer testified that she had never seen appellant lose his temper or do anything inappropriate with the children. She said that appellant treated Robbie as if he were his own son, and that she did not consider him to be a danger to Robbie. Moreover, the operator of the child care center Robbie had attended until one month before his death testified that she never observed anything out of the ordinary with respect to his physical condition, and Robbie's pediatrician testified that he never saw evidence of abuse. Appellant also points out that it was undisputed that some of Robbie's injuries predated June 11. In addition, it was generally conceded that the outside steps leading to the front door of the residence were unsafe, and there was evidence that other household members had fallen on them at one time or another. Finally, as regards the major injuries, appellant asserts that the medical testimony was "ambivalent." During cross-examination, both doctors acknowledged that it was possible that the injuries to the child's brain and abdomen could have been caused by a heavy adult falling on him from the steps. Appellant argues that "'[c]ould have been' is not sufficient to prove guilt beyond a reasonable doubt."

It was undisputed that Robbie's fatal injuries occurred while he was in appellant's sole care. The only disputed issue was whether the injuries had been knowingly inflicted or were the result of the accident described by appellant. Although the medical experts were willing to concede the possibility that some of Robbie's injuries could have resulted from appellant falling on the child from the steps, both doctors testified that the totality of Robbie's injuries could not be so explained. Each testified that, in his opinion, Robbie's death was a homicide resulting from repeated blunt force trauma. Viewing the expert testimony and all the other evidence in the light most

7

favorable to the verdict, we hold that the evidence supports the jury's finding beyond a reasonable doubt that appellant struck Robbie in the manner or manners alleged in the indictment, and that he did so with an awareness that this conduct was reasonably certain to result in death. *See* Tex. Penal Code Ann. § 6.03(b) (West 2003). Points of error one and two are overruled.

## IMPEACHMENT

Appellant was initially arrested on June 11 for outstanding traffic warrants. While in jail that night, appellant engaged in two telephone conversations with Cervantes. Both calls were recorded. In two points of error, appellant contends that the trial court erred by permitting the State to impeach Cervantes by playing a portion of the recorded conversations in which Cervantes expressed the opinion that appellant was guilty of murdering Robbie, and that the court further erred by refusing to give a limiting instruction in its jury charge regarding this impeachment evidence.

Originally called as a State witness, Cervantes was asked by the prosecutor without objection if she recalled three portions of her telephone conversation with appellant on the night of June 11:

• First, she was asked, "Do you recall [appellant] saying [Robbie] was fine, he was running around the house, he took a bath, he drank apple juice, and that he was fine?" She answered, "He didn't tell me that."

• Second, Cervantes was asked, [D]o you remember . . . [appellant] saying to you, hey, Nana, [Robbie] fell out of that chair and it's the chair that's in the damn computer room?" Once again, the witness said that appellant did not make this statement.

• Third, Cervantes was asked, "Do you recall telling [appellant] that he had done something that he shouldn't have done to Robbie? Do you recall that?" She replied, "I would never say that because I did not know what happened. To this day, I don't

8

know." The prosecutor persisted, "And right after that [appellant] said, so you think I done it. And you replied, I do, I do, I do, yep?" Cervantes answered, "I don't remember that. I wouldn't say that because how am I going to say that if I don't know?"

At this point, the trial court conducted a hearing outside the jury's presence to determine if the State would be allowed to impeach Cervantes's testimony by playing the relevant portions of the recorded telephone calls. The defense objected to the proposed impeachment on the grounds of hearsay, rule 403, lack of notice, and invading the province of the jury. The trial court overruled the objections and instructed the prosecutor, "[Y]ou may play specific statements that contradict exactly what she said." The jury was returned to the courtroom, the State resumed its questioning of Cervantes, and the prosecutor played the three pertinent excerpts from the recorded telephone conversations. Immediately thereafter, the court instructed the jury, "[T]he three recordings you've just heard are being offered for the purposes of impeachment only and are to be considered for that purpose only."

During her direct examination, the prosecutor also asked Cervantes about a fourth portion of her telephone conversation with appellant:

• "[D]o you recall in that conversation telling [appellant] that you didn't know what was wrong with his head, that there was something wrong with him? Do you recall saying that, ma'am?" Cervantes answered, "Maybe I did." The prosecutor then asked, "And did you also say that you were scared of him, that you were scared of letting him out?" Cervantes replied, "That I don't remember" but added, "It's a possibility." After being shown a transcription of the telephone call, Cervantes conceded, "I might have said it. . . . I was very, very angry, so I could have said anything.

In point of error three, appellant argues that the State should not have been allowed to impeach Cervantes's testimony denying that she had said that she was afraid of appellant, that there was something wrong with his head, or that he had committed the crime. Appellant urges that this was improper impeachment on a collateral matter, and that Cervantes's opinion of his guilt was an inadmissible opinion. This argument presents nothing for review because Cervantes did not deny making the statements and was not impeached in that regard. If the point of error is construed as urging that the State should not have been permitted to question Cervantes about those statements, the argument was not preserved for appeal because there was no objection to the questions.

If point of error three is construed as challenging the impeachment that was allowed, no reversible error is presented. Several witnesses, including appellant himself, testified that appellant initially said that Robbie had fallen from the chair in the computer room to no apparent ill effect. Cervantes's statement during the June 11 telephone conversation that appellant "had done something that he shouldn't have done to Robbie," and her affirmative response when appellant asked her if she thought "[he] done it," reflected Cervantes's belief that a simple fall from a chair could not explain what happened to Robbie. Further, Cervantes's expressed belief that appellant was responsible for Robbie's death—a responsibility that appellant admitted at trial—did not constitute an opinion that appellant was guilty of murder. Point of error three is overruled.

In point of error four, appellant contends that the trial court erred by refusing to include in its jury charge the limiting instruction regarding the impeachment evidence that it gave at the time the evidence was admitted. However, the record reflects that later in the trial, after the three excerpts from the recorded conversations were introduced for impeachment, the court

10

permitted the State to introduce the telephone conversations in their entirety as direct evidence.[2]

Because the evidence was no longer before the jury for a limited purpose, no further limiting instruction was required. *See Lane v. State*, 822 S.W.2d 35, 40 (Tex. Crim. App. 1991) (limiting instruction not required when evidence can be considered on any relevant issue); *Cantrell v. State*, 731 S.W.2d 84, 95 (Tex. Crim. App. 1987) (no limiting charge required if testimony could have been admitted for both impeachment and as direct evidence). Point of error four is overruled.

## OPINION TESTIMONY

Appellant contends that the trial court erred by permitting unqualified opinion testimony that Robbie had been beaten. The witness in question was Carl Davis, who in June 2007 was an investigator for the Bastrop County Sheriff assigned to the crimes against children division. Davis testified that on June 11, he and a child protective services worker were dispatched to the scene on highway 290. Davis was shown Robbie's body, which by that time had been placed in an ambulance. Davis was asked by the prosecutor, "As a child abuse investigator, can you tell me based on your experience in investigating child abuse cases what your initial investigative thought was when you saw the body of this child?" Defense counsel objected, "Judge, that would be an expert opinion. He has not been qualified to give that opinion at this point." The objection was overruled, and Davis stated, "My impression was that this child had been beaten."

---

[2] In his reply brief, appellant challenges the State's argument that the recordings were admitted as direct evidence. At the time the recordings were offered in evidence, appellant objected that the tapes were hearsay, bolstered other testimony, and were unfairly prejudicial. Appellant also objected that the tapes were only admissible for impeachment. Defense counsel's objections plainly manifested an understanding that the recordings were being admitted without limitation. Appellant does not bring forward a point of error challenging the admission of the recordings as a whole.

11

Appellant correctly notes that the State made no attempt to qualify Davis as an expert on child abuse. But opinion testimony may be offered by both lay and expert witnesses. Tex. R. Evid. 701, 702. Under rule 701, a lay witness may testify in the form of an opinion or inference that is rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. Moreover, a witness who is capable of being qualified as an expert may offer lay opinion testimony under rule 701. *Osbourn v. State*, 92 S.W.3d 531, 536 (Tex. Crim. App. 2002). A police officer is not precluded from offering lay opinion testimony regarding events which he has personally observed. *Id*.

The admissibility of evidence is within the discretion of the trial court. *Id*. at 537. The trial court could reasonably conclude that Davis's impression that Robbie "had been beaten" was rationally based on his personal observation of the body, and that this impression was helpful both to explain the officer's testimony regarding the subsequent course of the investigation and to assist the trier of fact in determining whether the child's injuries were the result of criminal conduct or an accident. No abuse of discretion is shown. Point of error five is overruled.

## JURY ARGUMENT

In his last point of error, appellant contends that the trial court erred by overruling his objection to the State's jury argument. At the conclusion of her remarks, the prosecutor stated:

> And we're not trying to play on your emotion, but we do want justice for Robbie. And to take a stand against child abuse takes courage and strength. And that's what I'm asking of all of you, to have the courage and to have the strength to take a stand and follow the law and find him guilty of capital murder.

12

[Defense counsel:] I'm going to object. This is improper prosecutorial argument in front of this jury about asking the jury to take a stand against child abuse. That is not what this jury is supposed to be considering and it is prejudicial.

[Prosecutor:] It's a proper plea for law enforcement, Your Honor.

THE COURT: Overruled.

[Prosecutor:] Asking you to take a stand and send a message to your community that child abuse will not be tolerated here, not here in Bastrop and not here in Texas. I'm asking you to do the right thing and find justice for Robbie, to find Christopher Murray guilty of capital murder.

Appellant contends that by this argument, the prosecutor improperly asked the jury to return a guilty verdict to demonstrate its disapproval of child abuse generally rather than basing their verdict on the facts and the law.

A plea for law enforcement is a permissible form of jury argument. *Borjan v. State*, 787 S.W.2d 53, 55 (Tex. Crim. App. 1990). A prosecutor's argument asking the jury to send a message to the community that violence will not be tolerated is a proper plea for law enforcement. *McGee v. State*, 774 S.W.2d 229, 240 (Tex. Crim. App. 1989). It is also proper for a prosecutor to argue on behalf of children and to remind jurors of the effect their verdict may have on this segment of the community. *Borjan*, 787 S.W.2d at 56. The prosecutor's argument urging the jury to follow the law and find appellant guilty of capital murder, and to thereby send a message that child abuse will not be tolerated in Bastrop County, was a proper plea for law enforcement. Point of error six is overruled.

The judgment of conviction is affirmed.

13

_____

Melissa Goodwin, Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Affirmed

Filed:   June 1, 2011

Do Not Publish

14