

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-75,010

**TRACY BEATTY, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM
### CAUSE NO. 241-0978-04 IN THE 241ST JUDICIAL DISTRICT COURT
### SMITH COUNTY

**PER CURIAM. JOHNSON, J., filed a dissenting opinion in which PRICE and HOLCOMB, JJ., joined. KEASLER, J., not participating.**

Appellant was convicted of capital murder and sentenced to death for killing his mother, Carolyn Click, in the course of committing burglary of a habitation.[1] Direct appeal to this Court is automatic.[2] Appellant raises twenty-four points of error. Finding no reversible error, we affirm the

---

[1] TEX. PENAL CODE §19.03(a); TEX. CODE CRIM. PROC. art. 37.071. Unless otherwise indicated, all future references to articles refer to the Code of Criminal Procedure.

[2] Art. 37.071, §2(h).

conviction and sentence.

## I. SUFFICIENCY OF THE EVIDENCE - UNDERLYING OFFENSE

In point of error two, appellant claims that the evidence is legally insufficient to show that he committed the underlying offense of burglary of a habitation. He argues that the evidence does not show that he entered Click's home without her consent or that he had requisite intent to commit burglary at the time he entered her home. In point of error four, appellant claims that the evidence is factually insufficient for the same reasons.

### A. Evidence at Trial

Appellant and Click had a volatile and combative relationship. Appellant moved into Click's house in early October 2003. Although Click told her next-door neighbor and close friend, Betty McCarty, that appellant had assaulted her several times in the past, Click said that she was excited about appellant's arrival. Click's excitement, however, vanished shortly after appellant moved in. McCarty testified that Click told her that she asked appellant to leave sometime in October and a second time on November 25, 2003—two days before Thanksgiving and the last day Click was seen alive. Around 4:00 p.m. on November 25th, Click went to McCarty's house. Click was "stressed out and crying." Click told McCarty that she was unhappy about the way things were going with appellant and that she had asked appellant to leave:

[Prosecutor:] What did [Click] tell you?

[McCarty:] That she had asked him to leave that day, and that – she said, "I put up with all I'm going to put up with, and I had asked him to leave," and she was upset about it. And that's the last time I saw her.

[Prosecutor:] Did she tell you what time that day she had told [appellant] to leave?

[McCarty:]  No, sir.

Although McCarty initially testified that Click said that she "asked" appellant to leave, she later clarified that Click said, "I told [appellant] to leave today."  McCarty did not know exactly when the conversation with appellant had occurred that day or when appellant was supposed to leave:

> [Defense counsel:]  Did [Click] say specifically when . . . she had that conversation with [appellant] or when he was supposed to leave by?
>
> [McCarty:]  No, sir.  I saw her at 4:00, and I didn't know anything about it until that time.  So I don't know what time she told him.

Appellant's cousin, Stacey Killough, testified that appellant arrived at her house later that day between 5:00 and 5:30 p.m. driving Click's car.  Killough testified that the drive from Click's house to her house takes approximately forty-five minutes.  Appellant smelled of alcohol but was not intoxicated.  Noting Click's absence, Killough became suspicious because Click was "very protective" of her car and never let anyone else drive it.  In fact, Killough had previously seen Click refuse to let appellant drive the car.  When Killough asked appellant where Click was, appellant told her that Click was out of town with a friend and would not be back for a few weeks.  Because Killough was busy, appellant stayed at Killough's house for only five to ten minutes.

Lieanna Wilkerson testified that she lived across the road from Click and that they had become close friends.  Click told Wilkerson that appellant had assaulted her on several occasions in the past.  Once appellant had "beaten her so severely that he had left her for dead."  Click was nevertheless excited that appellant was coming to live with her and hoped that she and appellant could mend their relationship.  After appellant moved in with Click, Wilkerson hired him to do odd jobs around her house because he was unemployed.  The two became friends, and Wilkerson referred

to appellant as "Trey." Appellant went to her house when he and Click would argue, which was daily. Toward the end of October and the first part of November, appellant house-sat for Wilkerson while she was out of town for several days. Wilkerson extended the offer to appellant because she was concerned about appellant and Click fighting, and she thought it would give them an opportunity to separate from each other. When Wilkerson returned home, appellant's suitcase was sitting in the living room. Appellant told Wilkerson that Click had packed his things and brought them over. Wilkerson understood this to mean that Click had packed appellant's suitcase in an effort to kick him out. Appellant, however, returned to Click's house and continued to live with her. According to Wilkerson, appellant and Click fought daily in November.

Wilkerson described a conversation that she had with appellant in the middle of November in which he expressed his anger with Click. Appellant told Wilkerson about missing a job interview with an electric company that he had been very excited about. Click refused to drive him to the interview, saying that "she just didn't feel like it." Wilkerson knew that appellant could not drive himself because Click refused to let appellant, who did not have a driver's license, borrow her car. Around the same time, appellant told Wilkerson that he thought about harming Click:

> [Wilkerson:] I know [appellant] had said they were underpinning her house, and he had gotten upset . . . . And they had gotten into a huge fight, and she was yelling at him, and he just made an offhand comment, "I can't believe she handed me that hammer." He said, "Because all I could think about was hitting her in the head with it." And I said, "Trey," and he goes, "Well, I couldn't do it." He said, "If I shoved her under there, she would have just started stinking."
>
> [Prosecutor:] She handed it – she being Carolyn Click, handed him a hammer. He thought about hitting her with it, rolling her underneath the house, but she would start to stink?
>
> [Wilkerson:] Right. And I just thought he was joking.

[Prosecutor:] Did he ever make any references to hurting her, to choking her, to hitting her?

[Wilkerson:] Several times he had said he just wanted to shut her up, that he just wanted to choke her and shut her up, that – they got into horrible fights.

Wilkerson testified that, on November 25th, appellant ate spaghetti at her house around 6:00 or 6:30 p.m. and stayed at her house until 10:00 p.m., when he went home. The next day, appellant gave Wilkerson a turkey. He told Wilkerson that he had bought it for Thanksgiving, but that Click had decided to go out of town with a man named "Junior," so they would not need it.

Appellant told various people multiple stories about how his mother died. Appellant first claimed to law enforcement officials that he came home one day and discovered that Junior had killed his mother. In response to this discovery, he stabbed Junior, disposed of his body in a lake, and buried his mother in the backyard. Appellant even took officers to a couple of different locations where he claimed to have submerged Junior's body. Appellant told them that he sliced Junior's body open so that it would fill with lake water and sink. In a statement three days later, appellant reiterated the story involving Junior. But four days after that, appellant told detectives that he "really didn't mean to" kill his mother: he "came in drunk," she "started bitching" at him, he choked her, she fell to the floor, and he did not realize that she was dead until the next day.

Appellant also told his cousin, John Clary, that he had "killed the bitch." He told Clary that he "had gone into the house, and there had been an argument, and [Click] had pulled a gun on him, so he went to choke her." When Clary told appellant that he needed to turn himself in or go back home, appellant inexplicably told Clary that he could not go back there because his mother "would have the cops looking for him."

Appellant also told differing stories about his mother's death to acquaintances with whom he spent time doing drugs, using Click's credit and debit cards, and disposing of Click's belongings in the weeks after her death. He initially told these acquaintances that his "aunt" had died and left him her property. He later told them "a friend" killed his mother and that he killed the friend to cover it up. He also said that he had killed "his mother's boyfriend" after discovering that he had killed Click and that he buried both bodies in the woods.

Appellant gave differing stories to Wilkerson as well. First, he told her that he came home to find Click dead. Junior killed Click and attacked appellant, so appellant killed him. He then described in great detail how he disposed of Junior's body by submerging it in the lake. He said that he buried his mother. Later, appellant told Wilkerson that he hired a friend to kill Click and that he then killed the friend. Finally, appellant said that he killed Click on the night of November 25th, when he returned home from having dinner at Wilkerson's house. Wilkerson testified:

> The very last thing that – incident that [appellant] told me what happened is he said when he left my house, he went directly across the street to her house and that she was waiting for him, and that when he came through the door, they had a horrible fight . . . .

Appellant told Wilkerson that he ended up choking Click until she fell to the floor. He said that he did not realize that she was dead until he woke up the next morning and saw her lying in the same place on the floor.

### B. Standards of Review

The legal sufficiency of the evidence to support a conviction is reviewed under the familiar

standard articulated by the United States Supreme Court in *Jackson v. Virginia*.[3]  Under the standard announced in *Jackson*, we ask "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[4]  This assessment affords appropriate deference "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts."[5]  The evidence is sufficient if the actions of the defendant before, during, and after the commission of the offense "show an understanding and common design to do the prohibited act."[6]  "Circumstantial evidence is as probative as direct evidence,"[7] and the cumulative force of the incriminating evidence may be sufficient to support a conviction.[8]  In a sufficiency review, we consider both admissible and inadmissible evidence.[9]

When assessing a claim of factual insufficiency on direct appeal, we consider all of the evidence in a neutral light and ask whether the evidence introduced to support the verdict, though legally sufficient, is nevertheless so weak or so against the great weight and preponderance of

---

[3]  443 U.S. 307 (1979); *see also Griffin v. State*, 614 S.W.2d 159 (Tex. Crim. App. 1981).

[4]  *Id.* at 319 (emphasis in original).

[5]  *Id.*

[6]  *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Cardova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)).

[7]  *Id.* (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

[8]  *Id.* (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)).

[9]  *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).  Appellant claims that some of the evidence supporting his conviction was hearsay, to which his attorney should have objected. We also note that the rules of evidence provide, "Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay."  TEX. R. EVID. 802.

conflicting evidence as to render the jury's verdict clearly wrong and manifestly unjust.[10] Although we review the evidence in a neutral light, we still "afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility."[11]

## C. Analysis

The indictment charged appellant with two alternative theories of capital murder—committing murder in the course of robbery and committing murder in the course of burglary of a habitation. The jury was given a special verdict form that required it to specify which theory it based its conviction on. The jury found appellant guilty of committing capital murder in the course of committing a burglary of a habitation. The jury was instructed under the following theory of burglary: A person commits the offense of burglary of a habitation if, without the effective consent of the owner, he enters a habitation with intent to commit a felony, theft, or assault.[12]

### 1. *Consent*

Appellant argues that the only evidence that he entered the house without Click's effective consent was Click's statement to McCarty at 4:00 p.m. on the 25th that she told appellant to leave. He points out that this was not the first time that Click asked him to leave and that their pattern was that they would fight and then make up. He also points out that the State presented no evidence of a forced entry. Specifically, he contends that there was no evidence that he ever stopped living with Click or that she did not consent to his entry the day that she was murdered. The State contends that

---

[10] *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006).

[11] *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

[12] TEX. PENAL CODE §30.02(a)(1).

the evidence that Click told appellant to leave was sufficient to establish that appellant entered the house without her consent.

Viewing the evidence in the light most favorable to the verdict, we can infer from Click's statements to McCarty at 4:00 p.m., Click's past physical altercations with appellant, and her apparent state of mind at that time, that Click did not want appellant to live in her house any more, and that she withdrew her consent for appellant to remain in the house—effective immediately. Even though McCarty testified that Click told appellant to leave "that day" and "today," viewing the evidence in a light most favorable to the verdict, a rational jury could infer that she expected appellant to leave immediately. To prove burglary, appellant must have entered Click's house after Click withdrew her consent. Therefore, there must be some evidence to convince a rational factfinder beyond a reasonable doubt that appellant left the house after Click told him to leave, and then returned later, entering with the intent to commit a felony, theft, or assault. Appellant's own statements supply such evidence.

Although appellant offered many conflicting accounts about his mother's demise to friends and authorities, appellant's self-incriminating accounts are consistent about one particular fact—he entered the house before killing Click, and Click was present in the home at the time of his entry. From this evidence, a rational trier of fact could have concluded that Click told appellant to leave, that afterwards she went over to McCarty's house, that she later returned home at a time when appellant was no longer present, and that appellant subsequently entered the house and killed her.

Moreover, appellant's own words support the conclusion that Click did not change her mind at some point after her 4:00 p.m. conversation with McCarty and consent to appellant's return.

Appellant drove Click's car on Thanksgiving and when he returned, Wilkerson said, "You know how upset she's going to be that you're driving her car." In response, appellant stated, "Since she's kicking me out anyway, I really don't care." Also when furthering the charade about Click's departure with Junior, appellant told McCarty that he expected Click to return home on December 17th and that Click expected him to vacate her house before she arrived.

Based on the foregoing, the evidence is legally sufficient to support the jury's finding that appellant entered Click's house without her consent. Additionally, when looking at all of the evidence in a neutral light, it is also factually sufficient to show appellant's unlawful entry into Click's house.

## 2. *Intent*

We construe appellant's contention that the State did not show that he had "the intent to commit a burglary at the time of entry" to be an attack on the State's proof that appellant's entry into the home was "with the intent to commit a felony, theft, or an assault." The evidence shows that appellant did not have a job, a driver's license, or much money. Appellant was angry and frustrated with Click for not allowing him to use her car and for refusing to take him places like job interviews. Appellant told Wilkerson about having thoughts of killing or assaulting Click. Further, appellant assaulted Click in the past, once so badly she was "left for dead." A rational jury could infer that appellant was angry after Click told him to get out and that he entered Click's house with intent to assault her again or kill her, or at least take some of her money or her possessions.[13] Viewing the

---

[13] *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) ("Intent and knowledge are fact questions for the jury, and are almost always proven through evidence of the circumstances surrounding the crime.").

evidence in a light most favorable to the prosecution, we conclude that a rational jury could have found beyond a reasonable doubt that appellant possessed the requisite intent at the time of entry to establish a burglary. Further, giving due deference to the jury's credibility determinations,[14] we conclude that the evidence is also factually sufficient in that regard. Points of error two and four are overruled.

## II. GUILT-PHASE ISSUES

### A. Inadequate Notice

In point of error three, appellant contends that the trial judge erred by failing to *sua sponte* quash the indictment. He claims that the indictment did not provide him adequate notice because it failed to describe the particular act or acts regarding the burglary allegations. He also complains about the re-indictment, which added the theory that appellant killed Click in the course of committing robbery and an "almost unlimited number of means."

So long as the indictment's allegations are sufficient to identify the accused person and the penal statute containing the offense alleged, then any defects in the indictment are forfeited unless raised before trial.[15] Appellant does not contend that he was unable to determine the penal statute describing the offense of which he was accused; therefore, he forfeited any complaint about lack of notice in the indictment by failing to raise the issue before trial. Point of error three is overruled.

### B. Trial Judge's Answer to the Jury Question

In point of error five, appellant claims that by giving an incorrect response to a critical jury

---

[14] *Lancon*, 253 S.W.3d at 705.

[15] *Teal v. State*, 230 S.W.3d 172, 178 (Tex. Crim. App. 2000).

question, the judge highlighted and exacerbated the factual insufficiency of the State's case. Appellant specifically complains about the judge's answer to the following inquiry from the jury regarding appellant's whereabouts on November 25th:

> Betty [McCarty's] testimony on the day of the murder Nov. 25, 2003. We have [a] conflict to whether Mr. Beatty was at home that whole day.

The parties and the judge discussed this inquiry and reviewed the transcript. Ultimately, the judge gave the following response, to which both parties affirmatively stated they had no objection:

> The Court would be unable to resolve your conflict as to whether [appellant] was at home the whole day by having any portion of the testimony of Betty McCarty read back to you in Court.

Appellant now contends that the trial judge's instruction was a misrepresentation of the evidence because a portion of the court reporter's record shows that McCarty testified that she did not see appellant at any time on November 25, 2003.

First, we observe that a trial judge's response to a jury inquiry during deliberations, even if erroneous, has no bearing on a reviewing court's sufficiency analysis, legal or factual, because a sufficiency analysis is based upon the elements of the offense as defined by the hypothetically correct jury charge for the case, and not upon any instructions the jury actually received.[16] Next, we observe that the harm appellant claims to have suffered flows not from the trial judge's instruction but from the failure to read back testimony that appellant viewed as important. Because appellant did not object to the failure to read back testimony, his complaint was forfeited.[17] Further, to the extent appellant can be said to be complaining about the trial judge's actual instruction, and assuming that

---

[16] *Wooley v. State*, 2008 Tex. Crim. App. LEXIS 762, *21 (June 25).

[17] TEX. R. APP. P. 33.1(a)(1)(A).

such an instruction were viewed as part of the jury charge, defense counsel's statement of "no objection" with respect to that particular instruction arguably *waived* any right to complain on appeal.[18]  And even if defense counsel's statement of "no objection" did not amount to a waiver, the failure to object means that a showing of "egregious harm" would be required before appellant could obtain a remedy for the supposed jury charge error on appeal.[19]  We see no egregious harm flowing from the trial judge's instruction, apart from the forfeited non-jury-charge error of failing to read back testimony.

With all that said, we nevertheless conclude that the trial judge's response was not erroneous. Appellant's supplied record reference to a portion of McCarty's testimony does not resolve any conflict about whether he was at home.  She simply did not see him go in or out:

> [Prosecutor:]  Now, let me ask you, you indicated that after the 25th when you had this conversation with Ms. Click at about 4:00 p.m. – is that right, ma'am?
>
> [McCarty:]  Yes, sir.
>
> Q.  That that's the last time you saw or talked to her.
>
> A.  Yes, sir.
>
> Q.  Okay.  Did you know where [appellant] was at that time?
>
> A.  No, sir.
>
> Q.  Had you seen him over at the house earlier that day?
>
> A.  No, sir.  I had been gone most of the day.

---

[18]  *Williams v. State*, 2008 Tex. Crim. App. LEXIS 692, *54 & *55 n.86 (June 11)(general statement of "no objection" to the jury charge insufficient to effectuate waiver of jury charge error, but waiver of a specific aspect of the charge is possible).

[19]  *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

Q.  Did you see him over at that house anymore that day?

A.  No, sir.

The judge made no misrepresentations with respect to the complained of testimony.  Point of error five is overruled.

### C.  Handwriting Exemplars

In points of error six, seven, and eight, appellant  raises three issues related to handwriting exemplars that the trial judge ordered him to provide.

Before trial, the State filed a motion to compel appellant to provide handwriting exemplars. Appellant objected, citing the Fourth and Fifth Amendments to the United States Constitution. When the State's handwriting expert, Denise Jarrett, attempted to get the exemplars, appellant refused to give them to her.   The State asked the trial judge a second time to order appellant to submit samples.   Appellant objected, citing the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections Ten, Thirteen, Fifteen, and Nineteen of the Texas Constitution, as well as any other applicable constitutional provision.  The judge overruled appellant's objections and ordered him to comply with the order.   Appellant told the judge that he would not comply with the order.  The State then asked the judge to hold appellant in contempt and to order appellant to return to court to give the exemplars.   The judge then scheduled a contempt hearing.

The next week, at the contempt proceeding, appellant was given another opportunity to comply with the order, but he refused.  After finding appellant guilty of violating the order, the judge imposed a $500 fine and six months' confinement.  The judge then informed appellant that he had

the right to counsel to challenge the order of contempt and sanctions via habeas or appeal. The State then gave notice of its intention to use appellant's failure to comply with the order and the contempt finding at appellant's trial.

Approximately two weeks later, after appellant still refused to comply with the order, the State urged the judge to hold a second contempt hearing. The judge held the contempt hearing immediately and found Beatty in criminal contempt of court for a second time. The judge imposed a $500 fine and six months' confinement in jail, which was ordered to run consecutively with the prior sentence. The judge then appointed counsel for appellant again to pursue an appeal or to file an application for a writ of habeas corpus.

At trial, over appellant's objections, including his objections under the Fifth Amendment and Texas Constitution, Article I, §10, the State was allowed to question Jarrett about appellant's refusal to provide exemplars in the face of the judge's order:

> Q. Ms. Jarrett, you're aware that there was a court order ordering the defendant to give you a handwriting exemplar?
>
> A. Yes, I am.
>
> * * *
>
> Q. Did you, prior to today, have an opportunity to meet with, sit down with Tracy Beatty in order for you to obtain a handwriting exemplar from Tracy Beatty?
>
> A. I've tried twice.
>
> Q. Were you successful?
>
> A. No, I was not.
>
> Q. Why not?

A. Because the defendant refused.

Q. Both times?

A. Yes, sir.

Q. Was there a court order in place both times?

A. I believe so.

In point of error six, appellant contends that the judge twice violated his rights against self-incrimination by holding him in criminal contempt because of his refusal to provide the exemplars. We conclude that appellant's challenge to the criminal contempt orders is not properly before us. The proper avenue for challenging a contempt order is through an original application for a writ of habeas corpus from the contempt proceedings.[20]  Point of error six is overruled.

In point of error seven, appellant claims that the trial judge erred in allowing the contempt convictions to be used as extraneous offenses during the guilt phase.  Appellant does not cite anywhere in the record where his contempt convictions were admitted into evidence as extraneous offenses during the guilt phase, and our own review of the record indicates that this evidence was not admitted at the guilt phase.  Indeed, the judge informed the parties that he would not permit evidence of the contempt orders to be admitted.  Point of error seven is overruled.

Finally, in point of error eight, appellant complains that the trial judge committed a Fifth Amendment violation when he allowed the State to present, through Jarrett's testimony, evidence that appellant refused to provide the exemplars and that such refusal was in violation of a court order.  At the outset, we observe that the trial judge did not err in ordering the exemplars.  It is well

---

[20] *Ex parte Thompson*, 2008 Tex. Crim. App. LEXIS 328, *10 (Mar. 5); *Ex parte Eureste*, 725 S.W.2d 214, 216 (Tex. Crim. App. 1986).

established that handwriting exemplars are non-testimonial and therefore do not warrant constitutional protection under the federal or state constitutions.[21] As a result, the prosecutor's comment upon appellant's refusal to comply with the trial judge's order did not violate appellant's Fifth Amendment right against self-incrimination.[22]

### D. Evidence of Click's Suicide Attempt

In point of error eleven, appellant contends that the trial judge erred in refusing to allow his defense attorney to question McCarty about Click's suicide attempt.

During trial, the State made an oral motion in limine to prohibit appellant from questioning McCarty about Click's suicide attempt, claiming that it was not relevant to any issue. Appellant argued that the evidence was relevant because the autopsy report showed that a bullet had been removed from Click's body, and he wanted to make sure that the jury would not get the false impression that appellant shot Click. The judge concluded that the evidence was not relevant but stated that, if evidence about the bullet was later admitted, then the defense would be entitled to recall McCarty to clear up any confusion.

Appellant also argued that the suicide attempt was relevant to his and Click's relationship. In a hearing outside the presence of the jury, appellant questioned McCarty on the matter. McCarty

---

[21] *Gilbert v. California*, 388 U.S. 263, 266-67 (1967); *Olson v. State*, 484 S.W.2d 756, 772 (Tex. Crim. App. 1972).

[22] *See Portuondo v. Agard*, 529 U.S. 61, 74-75 (2000)(prosecutor could comment upon the defendant's presence at trial); *South Dakota v. Neville*, 459 U.S. 553, 564-66 (1983)(prosecutor could comment upon the defendant's refusal to take a blood-alcohol test); *see also Pennsylvania v. Muniz*, 496 U.S. 582, 604 n.19 (1990)("since submission to a blood test could itself be compelled . . ., a State's decision to permit a suspect to refuse to take the test but then to comment upon that refusal at trial did not 'compel' the suspect to incriminate himself and hence did not violate the privilege")(citing *Neville*).

said that, five or six years earlier, Click told her that she tried to kill herself by shooting herself. Click said that she was "young" at the time and did not explain why she attempted suicide. McCarty testified that she did not know if the attempt had anything to do with appellant. The State objected, stating that the information was irrelevant. The trial judge sustained the State's objection. With Clary's testimony concerning what appellant told him about killing Click apparently in the forefront of his mind, defense counsel continued to push the issue. Counsel claimed that the suicide attempt was relevant to Click's propensity to use a gun against herself or others:

> If Carolyn Click was willing at one point in time to produce a gun and shoot herself in the spine, I would say that at some subsequent point in time it may add credibility to the defendant's version that he had to take the gun away from her to defend himself in self-defense to strangle her.

The judge adhered to his prior rulings, stating that the evidence was not relevant.

Evidence that is not relevant is not admissible.[23] Under Rule 401 of the Texas Rules of Evidence,

> "Relevant Evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[24]

When reviewing a trial judge's ruling to admit or exclude evidence, we give great deference to the judge's decision; therefore, we will reverse the ruling only when the record shows that the judge abused his or her discretion.[25] Moreover, we will uphold a trial judge's ruling if it was correct under

---

[23] T EX. R. EVID. 402.

[24] T EX. R. EVID. 401.

[25] *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).

any theory of law applicable to the case.[26]

Considering the evidence before the trial judge, we conclude that his determination that evidence of Click's suicide attempt was not relevant was not "outside the zone of reasonable disagreement."[27] Contrary to appellant's assertion, evidence that Click had attempted suicide in the past by shooting herself with a gun did not have any tendency to make it more likely that Click pulled a gun and wielded it at appellant and that appellant therefore had to defend himself. That Click was willing to use a gun on herself does not have any tendency to show that she was willing to use a gun against others. Further, appellant made no effort to demonstrate that such an inference, while intuitively illogical, is supported by some type of empirical data,[28] nor did he make any effort to show that the attempted suicide had any relevance to his relationship with her.[29]

Even if the evidence were relevant, by appellant's own admission, such relevance depends solely upon an inference that she acted in conformity with her prior behavior. Although a defendant may offer evidence relevant solely to show the victim's violent character through opinion or

---

[26] *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005) (citing *Sauceda v. State*, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004)).

[27] *Montgomery*, 810 S.W.2d at 391.

[28] *See Crockett v. State*, 803 S.W.2d 308, 312 (Tex. Crim. App. 1991) (observing that "the record is devoid of any evidence remotely tending to suggest, as an empirical matter, that persons traveling to Chicago are more likely to be transporting illegal drugs than are persons traveling elsewhere").

[29] *See* TEX. CODE CRIM. PROC. art. 38.36.

reputation testimony,[30] he may not do so by introducing specific instances of conduct.[31]   Point of error eleven is overruled.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

In points of error twelve, thirteen, and fourteen, appellant contends that his trial attorneys rendered ineffective assistance.  In point of error twelve, appellant asserts that his counsel was ineffective for conceding that appellant had committed the crime of murder when counsel knew that appellant had a viable self-defense claim.  Appellant contends that he had a viable self-defense claim because he told Clary that he killed Click after she pulled a gun on him.  In point of error thirteen, appellant faults counsel for failing to request a charge on self-defense or sudden passion at either stage of the trial.  And in point of error fourteen, appellant claims that counsel was ineffective at the punishment phase for failing to retain a risk-assessment witness with prison expertise.

We have consistently observed that usually "the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking tactical or strategic decision-making as to overcome the strong presumption that counsel's conduct was reasonable and professional."[32]  Here, we can only speculate why counsel acted or failed to act; thus, we presume that counsel's actions were within the wide range of reasonable and professional assistance.[33]  We

---

[30] TEX. R. EVID. 404(a)(2), 405(a).

[31] *Id.*, 404(b).

[32] *Sheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004); *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997); *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994).

[33] *Sheanette*, 144 S.W.3d at 510.

overrule appellant's ineffective assistance of counsel points of error.

### III.  PUNISHMENT PHASE ISSUES

### A.  Confrontation Clause

In point of error one, appellant claims that State's Exhibit 150 was inadmissible under the Sixth Amendment to the United States Constitution, as interpreted by the United States Supreme Court in *Crawford v. Washington*[34] and this Court in *Russeau v. State*,[35] and under Article I, §10 of the Texas Constitution.  State's Exhibit 150 contained two judgments of felony conviction and over eighty pages of prison disciplinary reports documenting appellant's failure to comply with prison rules.  The material contained in these documents included admissions made by appellant that were witnessed by the recording officer as well as statements made by other persons.

Before the parties presented evidence and outside of the jury's presence, appellant objected to State's Exhibit 150 on hearsay grounds:

> My objections are, is that while the documents themselves may be self-authenticating in the stack of records, they themselves contain statements which are a second level of hearsay and not admissible.  It's going to require the Court to look through it just to take a look and see what I'm discussing.  But we have to make that hearsay objection.
>
> * * *
>
> The concept of business records coming in, we understand that as an exception to hearsay, but we believe that there are substantially—there are a substantial amount of statements contained in those records which are a second level of hearsay.

After a response from the State, the judge asked appellant to clarify what he meant by secondhand hearsay.  Appellant explained:

---

[34]  541 U.S. 36 (2004).

[35]  171 S.W.3d 871 (Tex. Crim. App. 2005).

It's the concept of if a specific employee of the Texas Department of Corrections makes a statement and notes that statement that they themselves have knowledge of and that's made part of their record, we understand.

But when you looked through some of those documents – and I'll just say that almost every sheet has a statement like that. It is an employee that is writing down something that somebody else may have said to that person. . . . And so if they're going to be offering those secondhand hearsay remarks for the truth, and there's not certification of anyone in there, other than the person making the record, how do the business records exception pertain to them?

The judge then stated that he would rule when the State actually offered the exhibit and, in the meantime, that he would look through the documents. After a recess, the judge stated that he had reviewed the documents and was prepared to hear any objections and issue a ruling when the documents were offered.

The State offered State's Exhibit 150 during the direct examination of its first witness, a Smith County Sheriff's Deputy. Appellant lodged the following objection:

Judge, we object to the admission of that. We object that there's hearsay in there to which no exception applies. We object to relevance, 401, 402, 403 balancing. We object to the constitutionality under Article 1 of the Texas Constitution and the Fourth, Fifth, Sixteenth Amendment of the United States Constitution for admissibility at this stage of trial.

The judge overruled the objections and admitted the documents.

We conclude that appellant has not preserved his confrontation claims for review. When the admissibility of State's Exhibit 150 was discussed outside the jury's presence, the discussion involved only whether the documents contained double or secondhand hearsay and the applicability of the business records exception. A hearsay objection does not preserve error on Confrontation

Clause grounds.[36]   Neither the judge nor the parties mentioned the Confrontation Clause or

*Crawford*, which was handed down five months before the punishment phase.  Appellant's reference

to Article 1 of the Texas Constitution, which contains many individual rights provisions, was too

global to apprise the trial judge of the nature of his claim.[37]   And though appellant's objections

before the jury included references to the Fourth, Fifth, and Sixteenth Amendments, he never

actually cited the *Sixth* Amendment, which contains the Confrontation Clause.  Even if we assumed

that the trial judge interpreted appellant's reference to the Sixteenth Amendment to be intended as

a reference to the Sixth Amendment,[38] we nevertheless find that such a brief and generic reference

to the Sixth Amendment, contained within a string citation to various other constitutional provisions,

was not specific enough to make the trial court aware of his complaint.[39]   Finally, appellant failed

to draw the trial court's attention to the specific portions of this eighty-page exhibit that he believed

were inadmissible.  The trial judge has no duty to wade through a voluminous exhibit to separate

admissible from inadmissible portions:

> The trial court need never sort through challenged evidence in order to segregate the
> admissible from the excludable, nor is the trial court required to admit only the
> former part or exclude only the latter part. If evidence is offered and challenged
> which contains some of each, the trial court may safely admit it all or exclude it all,
> and the losing party, no matter who he is, will be made to suffer on appeal the

---

[36]  *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005).

[37] Tᴇx. R. Aᴘᴘ. P. 33.1(a)(1)(A)("with sufficient specificity to make the trial court aware of the complaint"); *see* Tᴇx. Cᴏɴsᴛ., Art. 1.

[38] Tᴇx. R. Aᴘᴘ. P. 33.1(a)(1)(A)("unless specific grounds were apparent from the context").

[39]  We note that the right to confrontation is one of several rights protected by the Sixth Amendment.  *See* U.S. Cᴏɴsᴛ., Amend. 6.

consequences of his insufficiently specific offer or objection.[40]

Point of error one is overruled.

## B. Handcuff Key

In point of error nine, appellant argues that the judge erred by admitting a handcuff key into evidence. Pursuant to a court order, the prosecution obtained a set of keys that was collected from appellant when he was booked into the Smith County jail. The State offered a handcuff key, found on appellant's key ring, into evidence at the guilt phase for record purposes only. But during the punishment phase, the State re-offered the key into evidence "for all purposes." Appellant objected to the State's offer, essentially arguing that the key was not relevant. Countering, the State argued:

> Judge, the fact that a person has a handcuff key on them who's been to the penitentiary on multiple occasions, has been in various jails on multiple occasions, who's been arrested on various occasions, who has escaped on at least one occasion that's been in evidence in this case, the fact that they have a handcuff key would certainly be relevant to whether they would intend to use it, if arrested, to try to escape, try to open up the handcuffs and escape. Again, I certainly think that would be something relevant.
>
> And additionally, this defendant – there's already been evidence that this defendant has possessed contraband while incarcerated in prisons, and I believe being in possession of a handcuff key would be relevant on all those issues.

The judge overruled appellant's objection, stating that it was relevant to punishment, specifically to the future dangerousness special issue.

Article 37.071, Texas Code of Criminal Procedure, declares that, in capital cases, "evidence may be presented by the state and the defendant or the defendant's counsel as to any matter that the

---

[40] *Reyna v. State*, 168 S.W.3d 173, 178 (Tex. Crim. App. 2005)(quoting *Jones v. State*, 843 S.W.2d 487 (Tex. Crim. App. 1992)).

court deems relevant to sentence . . . ."[41] At the penalty phase of a capital murder trial, the trial judge has wide discretion to admit or exclude evidence.[42] Relevancy questions "are generally left largely to the trial judge, and will not be reversed absent an abuse of discretion."[43]

At the punishment phase of a capital murder trial, the State has the burden of proving, beyond a reasonable doubt, the punishment issue of future dangerousness—that there is a probability that the defendant will commit criminal acts of violence in the future, so as to constitute a continuing threat, whether in or out of prison.[44] When deciding whether a defendant poses a continuing threat, the jury may consider, among other things, the following factors:

> the defendant's state of mind and whether he was working alone or with other parties; the calculated nature of the defendant's acts; the forethought and deliberateness exhibited by the crime's execution; the existence and severity of prior crimes; the defendant's age and personal circumstances at the time of the offense; whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; psychiatric evidence; and character evidence.[45]

The evidence at punishment showed, in part, that appellant: (1) killed Click only a few months after he was released on parole; (2) had a lengthy criminal record, which included escape,

---

[41] TEX. CODE CRIM. PROC. art 37.071 §2(a).

[42] *Ford v. State*, 919 S.W.2d 107, 114 (Tex. Crim. App. 1996); *Lane v. State*, 822 S.W.2d 35, 41 (Tex. Crim. App. 1991).

[43] *Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993).

[44] TEX. CODE CRIM. PROC. art. 37.071 §§2(b)(1), 2(c); *Ladd v. State*, 3 S.W.3d 547, 557-58 (Tex. Crim. App. 1999).

[45] *Druery v. State*, 225 S.W.3d 491, 507 (Tex. Crim. App. 2007) (citing *Wardrip v. State*, 56 S.W.3d 588, 594 (Tex. Crim. App. 2001)).

evading arrest, assault for striking Click, and injury to a child for shocking, striking, biting, and pulling the hair of an eighteen-month-old child; (3) had physically injured a prison guard, verbally threatened and spit on numerous other guards and fought with inmates when previously incarcerated; (4) had violated the conditions of his six-year probation term for injury to a child, and (5) had possessed a "shank" in jail while awaiting trial in this case. Evidence that appellant kept a handcuff key on his key ring, especially when combined with evidence of his prior escape and evading-detention offenses, made it more probable that appellant would attempt to escape from custody in the future. His prior criminal acts of violence toward authorities and other inmates while incarcerated makes it more probable that appellant would not hesitate to commit criminal acts of violence in effectuating an escape. Finally, appellant's history of committing violent criminal acts as a member of the general public, including when he was released on probation and parole, makes it more probable that appellant would commit additional acts of violence in the "free world" if he escaped. So appellant's possession of the handcuff key makes it more probable that he would constitute a continuing threat to both prison and free society. The trial judge did not abuse his discretion in admitting the evidence. Point of error nine is overruled.

### C. Comment on Right Not to Testify

In point of error ten, citing the United States and Texas Constitutions and Article 38.08 of the Texas Code of Criminal Procedure, appellant complains that the following portion of the State's closing argument constituted an improper comment on his failure to testify:

> It just – it amazes me that he will do the things he's done, hurt the people he's hurt, and then come in here and say do [sic] some kind of – "Oh, well, yeah, but you know what? It's your fault. It's your fault. It's your fault. You're trying to kill me. It's your fault."

Overruling appellant's objection, the trial judge concluded that the complained-of argument did not constitute a comment on appellant's failure to testify but was instead a response to the arguments made by the defense.

A comment on a defendant's failure to testify violates the federal and state constitutions and Article 30.08, Texas Code of Criminal Procedure.[46] We view the complained-of language from the jury's perspective, and "[t]he test is whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify."[47] The complained-of language must clearly refer to the defendant's failure to testify; "[i]t is not sufficient that the language might be construed as an implied or indirect allusion."[48]

Whatever else this portion of the prosecutor's argument may be, it was not a comment on appellant's failure to testify. The passage in question does not comment on any failure of appellant to do anything; instead, it purports to comment on something appellant said or did. The broader context shows that it was a comment on what defense counsel said.

In argument, defense counsel took the prosecutor to task for dehumanizing appellant and urged the jury not to sink to appellant's level in assessing punishment:

> And Ms. Sikes is very good at what she does. It's easier to kill somebody if you dehumanize them first; make them 100 percent evil; make them a monster; make

---

[46] *Wead v. State*, 129 S.W.3d 126, 128-29 (Tex. Crim. App. 2004); *Bustamante v. State*, 48 S.W.3d 761, 764 (Tex. Crim. App. 2001).

[47] *Bustamante*, 48 S.W.3d at 765.

[48] *Id.*

> them worthless. And you know what? It's easy to do when you have these kinds of facts, right? All you've got to do is just cross that last bridge and say there's nothing about him worth saving. He's worthless, 100 percent evil. He's all those things that the State says.
>
> I want to talk to you a minute about the cons – well, I probably should sit down and let Ken talk about this, because he's a lot better than I am – the concept of respect, respect for other people's opinions, respect for the law, respect for life. Tracy Beatty doesn't respect any of those. Does that mean you shouldn't? Does that mean I shouldn't?

Defense counsel then explained to the jurors that he respected their guilty verdict but disagreed with it. Several times, defense counsel called himself an "idiot" for missing obvious evidence that appellant was not guilty of burglary, the underlying crime that was used to raise appellant's offense from murder to capital murder. Defense counsel found "amazing" that a Texas Department of Criminal Justice official would say that convicted capital murderers "don't automatically go to administrative segregation." Regarding this "amazing" fact, defense counsel further stated:

> They want you to kill him because there's no safe place for him. And what's amazing – I'm getting back to it – what's amazing to me is that they won't put him straight in administrative segregation, but they can, and it has happened.

Defense counsel also told the jury that appellant was "not 100 percent evil" but "a child of God who has made terrible, horrible criminal decisions his whole miserable life."

It is to these types of comments made during defense counsel's summation that the prosecutor responded with the complained-of comment that we now set forth in its context:

> Understand something. I'm not killing the defendant. You, by your verdict, if it was yes or no, are not killing him. You're answering special issues based on the evidence. It just – it amazes me that he will do the things he's done, hurt the people he's hurt, and then come in here and say do some kind of – "Oh, well, yeah, but you know what? It's your fault. It's your fault. It's your fault. You're trying to kill me. It's your fault."

This comment was not one that a jury would "naturally and necessarily" view as pertaining to appellant's failure to testify. Point of error ten is overruled.

### D. Challenges to the Death Penalty Scheme

In a number of points of error, appellant raises attacks on the Texas death penalty scheme that we have already rejected. For each, we find it sufficient to set out appellant's claim and footnote the case or cases in which the claim was rejected. In point of error fifteen, appellant complains that article 37.071, §2(b)(1), violates the Eighth and Fourteenth Amendments to the United States Constitution because the aggravating factors are vague and do not properly challenge the jury's discretion. In doing so, appellant specifically claims that the statute is unconstitutionally vague because it fails to define the terms "probability," "criminal acts of violence," and "continuing threat to society."[49] In point of error sixteen, appellant contends that the Texas death penalty scheme violates the federal constitution because it does not allow for meaningful appellate review of a death sentence. In doing so, he complains that Texas law does not allow for appellate review of the mitigation special issue set out in article 37.071, §2(e),[50] that there is no longer any meaningful review of the future dangerousness issue because everyone convicted of capital murder will always be found to be a future danger,[51] that Texas law does not provide for a comparative proportionality

---

[49] *Camacho v. State*, 864 S.W.2d 524, 536 (Tex. Crim. App. 1993) (citing *Goss v. State*, 826 S.W.2d 162, 171 (Tex. Crim. App. 1992)).

[50] *Tong v. State*, 25 S.W.3d 707, 715 (Tex. Crim. App. 2000) (citing *McFarland v. State*, 928 S.W.2d 482, 498-99 (Tex. Crim. App. 1996); *Lawton v. State*, 913 S.W.2d 542, 556-58 (Tex. Crim. App. 1995)).

[51] *Valle v. State*, 109 S.W.3d 500, 502-03 (Tex. Crim. App. 2003).

review,[52] and that, because the mitigation special issue is open-ended and unstructured, there is no way to know which aggravating or mitigating factors the jury considered, thereby making appellate review impossible.[53] In point of error seventeen, appellant claims that the failure to assign a burden of proof on the mitigation issue renders the death penalty provision unconstitutional.[54] In point of error eighteen, appellant claims that the "10-12 rule," and the trial judge's conforming jury instruction, violates the federal constitution.[55] In point of error nineteen, appellant complains that the capital sentencing scheme's failure to inform the jury that a single hold-out juror results in an automatic life sentence violates the federal constitution.[56] In point of error twenty, appellant alleges that the death penalty scheme is unconstitutional because it gives the jury open-ended discretion.[57] In point of error twenty-one, appellant maintains that the capital sentencing statute's definition of "mitigating evidence" is facially unconstitutional because it limits the Eighth Amendment concept of mitigation to factors that render a defendant less morally "blameworthy" for commission of the capital murder.[58] Having decided the issues adversely to appellant's position, we reject his claims.

---

[52] *Anderson v. State*, 932 S.W.2d 502, 508-09 (Tex. Crim. App. 1996).

[53] *Lawton*, 913 S.W.2d at 556-57; *McFarland*, 928 S.W.2d at 499.

[54] *Lawton*, 913 S.W.2d at 558; *Blue v. State*, 125 S.W.3d 491, 501 (Tex. Crim. App. 2003).

[55] *Crutsinger v. State*, 206 S.W.3d 607, 613 (Tex. Crim. App. 2006) (citing *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004)); *Masterson v. State*, 155 S.W.3d 167, 175 (Tex. Crim. App. 2005).

[56] *Shannon v. State*, 942 S.W.2d 591, 601 (Tex. Crim. App. 1996).

[57] *Raby v. State*, 970 S.W.2d 1, 7 (Tex. Crim. App. 1998) (citing *Lawton*, 913 S.W.2d at 560; *McFarland*, 928 S.W.2d 499).

[58] *Id.* at 9.

Points of error fifteen through twenty-one are overruled.

### E. Smith County Prosecution

In point of error twenty-four, appellant claims that the administration of the death penalty in Smith County is inconsistent and unfair and therefore violates the federal and state constitutions. He claims that the administration of the death penalty is arbitrary and capricious because prosecutors are given unfettered discretion on whether or not to seek the death penalty–resulting in a lack of consistency among prosecutorial authorities in different jurisdictions. We have decided this issue adversely to appellant's position.[59]

Appellant also claims that the Smith County prosecuting authorities, in particular, have exercised their discretion in an unconstitutional manner. Citing a July 2005 "Associated Press" article, appellant contends that the prosecutor in his case allowed another person who committed a capital murder to receive consecutive life sentences under a plea agreement at the request of the victim's family. He claims that a cousin of his (who was also the victim's niece) wanted to testify that she did not want to see him receive the death penalty but was stopped from doing so.

Appellant's claim relies largely on events that occurred after his trial in 2004. Evidence relating to those subsequent events are not a part of the appellate record,[60] and the State has not been given an opportunity to produce its own evidence on the matter, which cannot occur in an appellate

---

[59] *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003) (citing *Ladd*, 3 S.W.3d at 574; *McFarland*, 928 S.W.2d at 510-11).

[60] *Young v. State*, 552 S.W.2d 441, 443 (Tex. Crim. App. 1977)(newspaper articles attached to a brief are not properly before the appellate court as evidence); *see also Ramirez v. State*, 104 S.W.3d 549, 550-51 (Tex. Crim. App. 2003)(document attached to notice of appeal "could not be considered as substantive evidence in support of a point of error").

forum.[61]  And appellant's claim that his cousin was "stopped" from testifying is misleading.  The trial court was attempting to rule upon a particular question defense counsel had asked, and the witness's wishes regarding appellant's execution were not responsive to that question.  That matter was subsequently cleared up, but defense counsel did not thereafter attempt to question the witness about her wishes regarding appellant's execution     Point of error twenty-four is overruled.

### IV.  Administration of the Death Penalty

In point of error twenty-two, appellant contends that the  manner in which the death penalty is administered is cruel and unusual and therefore violates the federal and state constitutions.  He appears to combine two separate claims in his briefing.  First, he argues that the sentencing scheme is unconstitutionally open-ended.  That argument has already been addressed in the previous section of this opinion.   Second, he claims that the lethal injection protocol may inflict intense and unnecessary pain on the executed person.  This latter claim is not ripe for review.[62]  Point of error twenty-two is overruled.

In point of error twenty-three, appellant claims that the state constitutional provision prohibiting "cruel or unusual punishments" confers broader protection than the Eighth Amendment's prohibition against "cruel *and* unusual punishments."  Though appellant does not expressly say so, it appears that this claim is meant to relate to the subject matter discussed in point of error twenty-two.  To the extent this claim relates to sentencing, we have held that the Texas capital sentencing

---

[61] *Amador v. State*, 221 S.W.3d 666, 676-77 (Tex. Crim. App. 2007)(supplementation rules cannot be used to create a new record in the appellate court).

[62] *Gallo v. State*, 239 S.W.3d 757, 780 (Tex. Crim. App. 2007).

scheme does not violate the state constitution's "cruel or unusual punishments" prohibition.[63]  To the extent the claim relates to the lethal injection protocol, then, like his federal constitutional claim, it is not ripe for review.  Point of error twenty-three is overruled.

The judgment of the trial court is affirmed.

Date Delivered: March 11, 2009
Do Not Publish

---

[63]  *Anderson*, 932 S.W.2d at 509.