# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00298-CR

### Lionel Leal, Appellant

### v.

### The State of Texas, Appellee

### FROM THE DISTRICT COURT OF CALDWELL COUNTY, 421ST JUDICIAL DISTRICT
### NO. 2010-223, HONORABLE TODD BLOMERTH, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A Caldwell County jury convicted appellant Lionel Leal of aggravated robbery and unlawful possession of a firearm. Leal appeals his conviction for aggravated robbery and, in four points of error, contends that the trial court improperly limited his voir dire examination; improperly admitted victim-impact testimony at the guilt/innocence phase of the trial; and overruled his objection to improper closing argument. For the reasons that follow, we affirm the judgment.

## BACKGROUND

On November 10, 2010 a Caldwell County grand jury returned a two-count indictment against Leal. The first count alleged that Leal committed aggravated robbery against Eddie Salazar on June 26, 2010, and the second count alleged that Leal unlawfully possessed a firearm on the same date. The indictment also alleged that Leal had a prior felony conviction, for purposes of enhancement of punishment. A jury was selected and sworn, and Leal pled not guilty

to count one and guilty to count two. The jury found him guilty of both counts. Leal elected for the jury to assess punishment, and he pled true to the enhancement paragraph in the indictment. At the punishment phase of the trial, the State introduced evidence of multiple prior misdemeanor and felony convictions of the appellant, including theft, criminal trespass, failure to identify, sexual assault, and failure to register as a sex offender. The jury assessed punishment for count one of 81 years' imprisonment and a $10,000 fine and for count two of 20 years' imprisonment and a fine of $10,000. The sentences were to run concurrently. Leal appeals his conviction on the first count.

Testimony at trial included that of Leal, Salazar, a forensic scientist, and several law-enforcement officers. Also admitted into evidence and shown to the jury were two video recordings, one of Leal's apprehension by Officer Josh Childress and the other of his conversation with Officer William Templeton while in custody shortly after his arrest. The jury also saw several photographs of Salazar's injuries and the crime scene.

Salazar testified that he met Leal for the first time at a park in Lockhart on June 25, 2010. After talking for a while, he and Leal went to a nearby bar together. After leaving the bar around midnight, the two proceeded to Salazar's house where they drank beer and watched television. Because Leal had no place to stay, Salazar allowed him to stay in his living room for the night. At one point in the early morning hours, Salazar was lying on his bed listening to music when Leal entered his bedroom, held a gun to Salazar's head, and demanded that Salazar give him his wallet and bank-card pin number. Salazar gave his wallet and a false pin number to Leal, but when Leal turned his head away upon hearing a noise, Salazar attempted to wrestle the gun away from him. A struggle ensued, during which Leal displayed a knife and stabbed Salazar several times in the head

and arm. Although seriously injured, Salazar managed to run away from his house and go to the home of his mother, who lived around the corner, where the authorities were called.

Officer Daniel Williams, who was the first member of law enforcement to respond to Salazar's call for help that morning, testified at trial after consulting his written report memorializing what Salazar had told him shortly after the incident. Williams's testimony generally corroborated Salazar's story. Williams also testified about how Salazar visually appeared upon his encountering him—Salazar's body and clothes had a lot of blood on them, and Williams observed muscle protruding from the stab wound on Salazar's arm. Williams also testified about the description of Salazar's assailant, as provided by Salazar.

Evidence at trial also established that while Salazar was providing his statement to Williams and receiving medical care from the paramedics, several officers and a SWAT team were dispatched to his house, as they were concerned that his assailant was still inside the residence and armed with a loaded weapon, as Salazar had stated might be the case. Officer Jesse Garcia was one of the on-call SWAT officers who responded. After the assailant was not found on the premises, Garcia began driving home. On his way, he spotted a man walking along the highway with a red backpack, later identified as Leal. Garcia testified that the man was looking around in every direction, reaching inside the backpack, and acting suspiciously, especially for that hour of the morning and location. Garcia called in the information to another officer for further investigation and continued home. Garcia also testified that he was later contacted by a concerned citizen who had found a credit card with Salazar's name on it on the ground near where Garcia had spotted Leal.

Officer Josh Childress was the on-duty police officer closest to where Garcia had spotted the man with the red backpack, and Childress made contact with the man shortly after Garcia's report. The man turned out to be Leal, although he falsely identified himself as Jerry Rhinard to Childress and the other officers who arrived on the scene as back-up. As Childress pulled his car up towards Leal, Leal first put his arms in the air, then removed his backpack from the front of his body and placed it on the ground, and then raised his arms again. Childress testified that he believed when he first spotted Leal, he was wearing the backpack on his back. After Childress turned his car around and approached Leal head-on, he noticed that Leal was wearing the backpack on the front of his body. After frisking Leal for weapons and asking him some questions, Childress looked inside Leal's backpack. Inside were a loaded and cocked .22 caliber Beretta, a magazine containing five rounds of ammunition, a holster with a belt clip, and a box of .22 caliber ammunition. Also inside Leal's backpack were personal photographs belonging to Salazar and a Lone Star card, Medicare card, Lockhart First National Bank Account ID card, and social security card, all bearing Salazar's name. Leal's shoes were covered in blood, as was a knife and a pair of shorts also contained in the backpack. The blood was later identified through DNA testing to be Salazar's. Leal had no identification on his person indicating his true identity.

Leal testified at trial, but his account was vastly different from that of Salazar and Officer Williams. His testimony about his encounter with Salazar was also inconsistent with the several different stories he provided to police officers on the date of the incident, as testified to by Officer Childress and Officer William Templeton and as revealed on the video tape of his interrogation at the police station. Leal testified that he had found Salazar's wallet on Salazar's

4

porch earlier in the day, before the two went to the bar, and Salazar had asked him to hold onto it for him. Then, after the two had returned to Salazar's home and had drunk more beer and watched television, Leal had fallen asleep on the couch but woken up to find Salazar screaming at him, brandishing a knife and demanding to know why his wallet was in Leal's backpack. Leal took out his handgun because he was afraid Salazar was going to stab him and, after Salazar attacked him with the knife, the gun was knocked to the floor and the two struggled over the knife, during which time Leal stabbed Salazar. After Salazar ran away, Leal picked up the backpack containing Salazar's wallet, placed the gun and knife inside it, and left.

Leal further testified that he was in Lockhart, having just arrived from Colorado by airplane the day before, to find his friend Jerry Rhinard. Leal stated he wanted to return some of Rhinard's possessions, namely a jacket and some pay stubs from a carnival where Rhinard had allegedly worked. Leal claimed that Rhinard had inadvertently left his belongings in the hotel room the two had shared in Colorado. When challenged by the State on cross examination about how Leal could have recently stayed in a hotel with Rhinard, who was then serving time in prison, Leal testified that Rhinard has a twin brother who sometimes impersonates Jerry. Although Leal had told officers on the incident date that his name was Jerry Rhinard and that he traveled a lot due to working for a carnival, Leal denied on the stand that he had worked for a carnival or had used Rhinard's identity to get around the requirements of registering as a sex offender, as such persons are not allowed to work at carnivals. Leal also testified that he obtained the gun he used in the incident with Salazar from Rhinard's girlfriend, whom he was unable to identify by name at trial and who allegedly picked him up from the airport when he arrived the day before.

5

**ANALYSIS**

**Voir dire restrictions**

Leal's first two points of error complain that the trial court improperly limited his voir dire examination by disallowing two allegedly proper questions related to Leal's defensive theory. The first question about which Leal complains asked of prospective juror Ms. Prasek: "Do you think because a person is a felon they don't have a right to protect themselves with a firearm?" The trial court sustained the State's objection to the question as being improper.

This question followed a line of inquiry by defense counsel seeking to hear the venirepersons' opinions about the use of a self-defense theory by convicted felons. Shortly before the question at issue, defense counsel had asked of another prospective juror, Ms. Lindberg: "So the fact that a person might have [a firearm] and if they were illegally holding a firearm, you don't think they should have a self-defense theory?" Lindberg responded, "No," to which defense counsel further queried: "Even if the judge instructed you that that's not the law, that you have the right to protect yourself. . . ," at which point the State interrupted to object, arguing that it was a misstatement of the law because the defensive theory depends on the location of the person asserting the defense. The trial court ordered defense counsel to clarify the question or else the objection would be sustained. Defense counsel rephrased the question to Lindberg: "If a person has a firearm and it otherwise would be reasonable to defend yourself with it, the fact that a person is a felon, would you all of a sudden not allow them to have that right to protect themselves?" The State did not object to that question. Then defense counsel asked the question of Prasek about which appellant

6

complains. The trial court reiterated its earlier ruling on that form of the question: "I sustained. It's not proper."

Rather than rephrasing the question to include a similar qualifying fact situation as the question she posed to Lindberg and again posing the query to Prasek, defense counsel moved on to another prospective juror, Ms. Bennett, asking her a question substantively similar but with appropriate qualifying facts ("[C]an you see a situation where a person would have a right to protect themselves from injury by use of a firearm or a knife?"). The State did not object to this question.

Shortly after the above exchanges, defense counsel asked the question that is the basis of appellant's second point of error: "Ms. Wright, do you understand the concept, that a person has the right to defend themselves?" Again, the State objected, and at a bench conference the trial court informed defense counsel: "You can ask whether [defendant] has a right to defend, but you need to define what you're talking about. There is deadly force and undeadly [sic] force." Defense counsel indicated agreement by saying, "Right," and the objection was sustained. Again, rather than rephrasing the question or further pursing that line of inquiry with Wright, defense counsel changed the subject, proceeding to ask a different prospective juror about the one-witness rule.

When an appellant challenges a trial judge's limitation on the voir dire process, the reviewing court must analyze the limitation for an abuse of discretion, the focus of which analysis is whether the appellant proffered a proper question concerning a proper area of inquiry. *Howard v. State*, 941 S.W.2d 102, 108 (Tex. Crim. App. 1996); *Caldwell v. State*, 818 S.W.2d 790, 793 (Tex. Crim. App. 1991). If the question was proper and the defendant was prevented from asking it, harm is presumed because the defendant has been denied his constitutional right to be heard and the related

7

ability to intelligently exercise his peremptory strikes. *See Jones v. State*, 223 S.W.3d 379, 382-83 (Tex. Crim. App. 2007) ( "constitutional right to be heard requires permitting the (proper) question defense counsel wishes to ask, not the one the trial court believes adequately protects the defendant"); *Caldwell*, 818 S.W.2d at 793. A question is proper if it seeks to discover a juror's views on an issue applicable to the case. *Caldwell*, 818 S.W.2d at 794. However, a trial court is given broad discretionary authority to impose reasonable restrictions on the voir dire process. *Id.* at 793. In particular, a trial court may restrict confusing or misleading voir dire questions. *Howard*, 941 S.W.2d at 108. The right to use force against another person in self-defense is sufficiently qualified under the Penal Code, and it is only appropriate that a trial court would require reasonable restrictions on such blanket queries as whether a person as the "right to defend himself." *See* Tex. Penal Code §§ 9.31, 9.32 (outlining when one is justified in using non-deadly or deadly force against another).

When a trial court sustains an objection to a question but does not impose an absolute limitation on defense counsel's right to question prospective jurors about a particular subject matter, the defendant's right to voir dire examination is not improperly restricted. *See Guerra v. State*, 771 S.W.2d 453, 468-69 (Tex. Crim. App. 1988). If the trial court disallows a question but places no absolute limitation on the underlying substance of a defendant's voir dire question, it is incumbent upon defense counsel to rephrase the improperly phrased query; otherwise, the defendant waives objection to the voir dire restriction. *Howard*, 941 S.W.2d at 108; *Guerra*, 771 S.W.2d at 468.

Here, the trial court placed no absolute limitation on defense counsel's proposed area of inquiry: a felon's assertion of self-defense by using a deadly weapon. The court merely deemed

8

improper the overly broad form of the questions and urged defense counsel to clarify the factual scenario about which she was inquiring. We conclude that such restriction on form rather than substance was well within the trial court's discretion, and the court did not abuse its discretion in deeming the complained-of questions improper, as phrased, and requiring defense counsel to reasonably restrict the questions so as to not mislead or confuse the venirepersons. In the first instance, defense counsel proceeded with a line of questioning that was more factually limited but failed to ask the newly and properly phrased questions to the prospective juror at issue. In the second instance, defense counsel altogether ceased questioning on the topic and began questioning other veniremembers about unrelated issues. It was incumbent on defense counsel to rephrase the improperly phrased queries. *See Guerra*, 771 S.W.2d at 468. Failing to do so, the defendant cannot now complain of improper voir dire restriction, and we accordingly overrule appellant's first two points of error.

**Victim-impact testimony**

Leal's third point of error complains that the trial court abused its discretion when it permitted the State to present victim-impact evidence during the guilt/innocence phase of the trial. After defense counsel finished her cross-examination of Salazar, the State on redirect examination asked one additional question of him: "How has this affected your life?" Defense counsel immediately objected "as to relevance," which objection the trial court overruled. Salazar then answered the question: "Well, now I drink more beer. I mean, I can't sleep. I don't sleep in the same room no more. I sleep in the living room, you know. I always have nightmares, every day. Sometimes, you know, I just - - I ain't going to lie to you."

Salazar's testimony clearly falls within the category of victim-impact testimony. *See Lane v. State*, 822 S.W.2d 35, 41 (Tex. Crim. App. 1991) (outside context of homicide cases, victim-impact testimony is generally defined as evidence regarding physical or psychological effect of crime on victims themselves); *Espinosa v. State*, 194 S.W.3d 703, 711 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (victim-impact evidence may include physical, psychological, or economic effects of crime on victim or victim's family). Although victim-impact testimony may be admissible during the punishment stage if it "has some bearing on the defendant's personal responsibility and moral guilt," *Stavinoha v. State*, 808 S.W.2d 76, 79 (Tex. Crim. App. 1991), such evidence is generally inadmissible during the guilt/innocence phase because it does not have the tendency to make more or less probable the existence of any fact of consequence with respect to guilt or innocence. *See Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990) (victim's testimony about future hardship as paraplegic was irrelevant on guilt issue and thus inadmissible over objection); *see also* Tex. R. Evid. 402 (evidence that is not relevant is inadmissible). The State concedes that the trial court erred in admitting Salazar's victim-impact testimony over the defendant's objection, and we agree.

Having found error, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment. Tex. R. App. P. 44.2. If the error is constitutional, we apply rule 44.2(a) and reverse unless we determine beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. Tex. R. App. P. 44.2(a). Otherwise, we apply rule 44.2(b) and disregard the error if it does not affect the appellant's substantial rights. Tex. R. App. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g). Constitutional

10

error is only present when a ruling is constitutionally required; mere misapplication of the rules of evidence is not constitutional error. *Alford v. State*, 22 S.W.3d 669, 673 (Tex. App.—Fort Worth 2000, pet. ref'd). Thus, erroneously admitted victim-impact evidence does not amount to constitutional error. *Karnes v. State*, 127 S.W.3d 184, 196 (Tex. App.—Fort Worth 2003, pet. ref'd); *Lindsay v. State*, 102 S.W.3d 223, 228 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). We therefore consider whether the error affected Leal's substantial rights. Tex. R. App. P. 44.2(b).

A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). To determine whether the substantial rights of the appellant were affected, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, the arguments, and the voir dire. *Motilla v. State*, 78 S.W.3d 352, 355-58 (Tex. Crim. App. 2002). A criminal conviction should not be overturned for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but slight effect. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). The strength of the evidence of guilt, especially if it is overwhelming, is a factor to be considered. *Motilla*, 78 S.W.3d at 357-58. Whether the State emphasized the error can also be a factor in the appellate court's consideration. *Id.* at 356. If there are "grave doubts" about whether the error did not affect the outcome, then the error is treated as if it did affect the outcome. *Fowler v. State*, 958 S.W.2d 853, 865 (Tex. App.—Waco 1997), *aff'd*, 991 S.W.2d 258 (Tex. Crim. App. 1999).

11

After examining the record as a whole, we conclude that the admission of Salazar's testimony about how the incident has affected his life had only a slight effect, if any, on the jury during the guilt/innocence phase of the trial. The remainder of Salazar's testimony, if believed by the jury, was sufficient to prove beyond a reasonable doubt that Leal committed aggravated robbery against him. Also, the State did not emphasize the error and did not revisit the issue during the rest of the trial. We cannot say that we are in "grave doubt" about whether the error affected the outcome, and we have a fair assurance on this record that the error had little to no effect on the jury's guilty verdict. Given the strength of the evidence of guilt, we find the erroneous admission of the victim-impact testimony harmless. Accordingly, we overrule Leal's third point of error.

**Speculative closing argument**

Leal's fourth point asserts that the trial court abused its discretion by permitting the State to make improper jury argument, in which he contends the prosecutor accused Leal of being prepared to "commit capital murder." In his closing argument at the conclusion of the guilt/innocence phase of the trial, the prosecutor made the following statements:

> When Officer Williams pulls up, there is a moment when the Defendant is turning around and looking at the police officer where you can almost see something going through his mind. That backpack was on backwards before he turned round. And when he came back, it was on his chest. And there's a slight moment of hesitation before the Defendant puts his hands up, takes his bag off and lays it down. What if he had reached in there for that firearm that was cocked?

The trial court overruled the appellant's objection that the argument was introducing facts not in evidence. Leal argues that the section of the above-referenced argument asks the jury

12

to speculate about whether he would have committed capital murder against a police officer[1] because it introduces facts not in evidence and leaves to the jury's imagination whatever extraneous facts may be needed to support the conviction. *See Berryhill v. State*, 501 S.W.2d 86, 87 (Tex. Crim. App. 1973) (logical deductions from non-evidence are not permitted, and prosecutor's reference in closing argument to sources of evidence to which he had access but that were not admitted at trial implied that such evidence existed and left jury to speculate about what such evidence was). The State argues that the prosecutor's statement was a reasonable deduction from the evidence admitted during trial and that, even if not, there was no harmful error resulting therefrom.

The State's argument to the jury must fall within one of the following four generally permissible areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement. *Felder v. State*, 848 S.W.2d 85, 94-95 (Tex. Crim. App. 1992). The entire record must be considered in determining the propriety of the prosecutor's argument, not just isolated statements. *Mosley*, 686 S.W.2d at 183. Generally, improper jury argument will not constitute reversible error unless, in light of the record as a whole, the argument is extremely or manifestly improper, is violative of a statute, or injects new facts, harmful to the accused, into the trial. *Cannon v. State*, 668 S.W.2d 401, 404 (Tex. Crim. App. 1984). An appropriate harm analysis for improper jury argument uses the following three-factor test: (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's

---

[1] We note that the State's argument erroneously identified Officer Williams rather than Officer Childress as the first officer on the scene during which the defendant's actions are summarized. However, we consider this distinction irrelevant for the purposes of analyzing Leal's contention that the State's argument introduced the not-in-evidence fact that he was prepared to "commit capital murder" and that the argument improperly invited jury speculation.

13

remarks); (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction or punishment absent the misconduct (the strength of the evidence supporting the conviction). *Mosley*, 983 S.W.2d at 258-60. In determining whether improper prosecutorial jury argument is harmless, we must calculate as much as possible the probable impact of the error on the jury in light of the entire record. *Orona v. State*, 791 S.W.2d 125, 130 (Tex. Crim. App. 1990).

Arguments that invite speculation by the jury, when such speculation is a reasonable deduction from the evidence, are not necessarily improper. *See Wolfe v. State*, 917 S.W.2d 270, 280 (Tex. Crim. App. 1996) (rhetorical questions are generally within scope of jury argument, if based on reasonable deduction from evidence); *Hudson v. State*, 675 S.W.2d 507, 511 (Tex. Crim. App. 1984) (jury argument that, had defendant not been apprehended by police, he would have continued his prowling of home and gone back to it, and that he had "different things in mind" for occupants than simply "cutting the telephone wire," was reasonable deduction from evidence and thus proper); *Porter v. State*, 601 S.W.2d 721, 723 (Tex. Crim. App.1980) (prosecutor's argument that "people can be killed in armed robberies" even though no one was killed in offense was proper); *Cain v. State*, 893 S.W.2d 681, 684 (Tex. App.—Fort Worth 1995) (prosecutor's argument that victims could have been killed had they tried to take loaded gun away from defendant, whose finger was on trigger, was "reasonable, logical, and proper deduction from the record"), *aff'd*, 947 S.W.2d 262 (Tex. Crim. App. 1997); *Gonzales v. State*, 831 S.W.2d 491, 492 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd) (question positing "what would have been the difference if [appellant] was two steps closer when he slashed --?" was proper because it was reasonable deduction from evidence); *Gonzales v. State*, 807 S.W.2d 830, 836 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd)

14

(prosecutor's argument to jury to consider what would have happened if grandmother and aunt of deceased had arrived at murder scene five minutes earlier was permissible).

In light of the foregoing precedent, we conclude that the State's posing the question, "What if [the defendant] had reached in [his backpack] for that firearm that was cocked?" was a reasonable deduction from the evidence at trial. The State's argument merely summarized evidence that was properly before the jury in the form of the officers' testimony and the videotape the jury viewed of the officers' first contact with Leal, and then made a reasonably deductive, albeit speculative, query about that evidence. The defendant had a cocked, loaded weapon in the front pocket of his backpack, and the evidence of his apprehension demonstrated actions indicating he might have been poised to pull out his loaded weapon: he had been spotted reaching into his backpack; he appeared to have switched the backpack's location from his back to his chest upon being approached by Officer Childress; and he raised his hands in the air and then lowered them to remove his backpack without being instructed to do so. Although the State's question speculated action that was not directly in evidence, we conclude that such speculation was a reasonable inference based on this record rather than an injection of new facts. The jury argument at issue here is analogous to the line of cases referenced above holding that even speculative argument, if constituting a reasonable deduction from the evidence, is proper.[2]

---

[2] Appellant cites case law wherein, based on the particular facts, the State's argument was held improper because it injected new, prejudicial facts into the record. *See Ex parte Lane*, 303 S.W.3d 702, 711 (Tex. Crim. App. 2009) (in drug possession trial, prosecutor's closing argument that "people" sell methamphetamine to children, who in turn use the drug and become addicts, was improper for referring to facts neither in nor inferable from evidence); *Walker v. State*, 664 S.W.2d 338, 340 (Tex. Crim. App. 1984) (in burglary trial, jury argument that defendant's "job" was to commit burglaries and that defendant made his living by doing so was improper and outside record because it called for jury to speculate as to other activities of accused, not shown by or inferable from evidence). Upon reviewing these cases, we conclude that the argument at issue here is more analogous to that held proper in the line of cases referenced *supra*.

15

However, even if the prosecutor's argument was improper, we conclude that any error resulting therefrom was harmless and does not warrant reversal, after reviewing the entire record in light of the three-factor *Mosley* test. The first factor, considering the severity of the misconduct, weighs in favor of harmless error. The prosecutor's comments summarized facts in evidence and posed one "what if" question, which reasonably followed from those facts. Leal argues that the argument was prejudicial because it invited the jury to speculate that the defendant was poised to "commit capital murder," but there could have been other scenarios that those facts and "what if" question might have conjured, for instance the officer's drawing of his weapon in response and potential injury or death to Leal. The prosecutor did not place a label on the defendant or speak to what the defendant's intent was. Rather than injecting new facts into the record, the State posited a hypothetical, rhetorical question about a reasonably likely scenario based on the facts in evidence. Also, the alleged improper argument consisted of ten lines out of the total of approximately eleven pages of the State's closing argument at the guilt/innocence phase, divided by approximately fourteen pages of closing argument by the defendant's counsel. On this record, the severity of the misconduct, if any, is relatively small.

Turning to the second factor, we consider whether the trial court gave any curative instruction, assuming the argument was improper. Ruling on Leal's objection, the trial court informed the jury that "reasonable inferences can be drawn," but it also followed that statement with the admonishment: "This is closing argument. It is *not evidence*." (Emphasis added.) Additionally, the State did not emphasize the alleged error nor return to it at a later time. Once the objection was overruled, the State moved on to other issues in its argument. We conclude that this factor

16

has a neutral effect on the determination of whether the error was harmless, as the trial court did imply that the argument was a reasonable inference but also instructed the jury that the argument was not evidence.

We find that the third factor—the strength of the evidence supporting the conviction and punishment—weighs heavily in favor of the State. The strength of the victim's testimony, as well as that of the other evidence supporting the State's case, was high. Also, because Leal was on trial for aggravated robbery, the evidence pertaining to his apprehension was of minimal significance to the elements on which the State had the burden of proof, to wit: that defendant committed robbery using or exhibiting a deadly weapon. Salazar's testimony, as well as the fact that Leal had in his possession Salazar's wallet upon apprehension, was sufficient to prove beyond a reasonable doubt these elements, and we conclude that this third factor weighs in favor of harmless error with respect to Leal's conviction.

Yet, Leal asserts that the improper argument likely influenced the jury to assess a harsher punishment against him. However, our review of the entire record confirms that in assessing punishment, the jury was influenced little to none by this argument, even though the State briefly revisited the argument at the punishment phase, to which the defendant did not object. We conclude the jury most likely sentenced Leal towards the higher end of the punishment range because of evidence such as: the extent of injuries Salazar sustained, the violence and fear inflicted by the defendant in the victim's own home, the defendant's numerous inconsistent explanations to the arresting officers about what had occurred on the date in question, and the defendant's multiple prior criminal convictions. We conclude that the third factor weighs heavily against reversal and,

combined with the other two factors, leads us to conclude that if the State's jury argument was improper, any error resulting therefrom was harmless. Accordingly, we overrule Leal's fourth point of error.

## CONCLUSION

Upon review of the entire record, we conclude that the trial court did not err as alleged by the appellant or, to the extent that the court did err, its error was harmless. We therefore affirm the trial court's judgment.

_____

Melissa Goodwin, Justice

Before Justices Puryear, Goodwin, and Field

Affirmed

Filed: February 21, 2014

Do Not Publish